E-FILED
Monday, 29 March, 2021  04:39:07 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| MARK ALAN WINGER, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 10-3169 |
| | ) | |
| BRITTANY GREENE[1], Warden, Western | ) | |
| Illinois Correctional Center, | ) | |
| | ) | |
| Respondent. | ) | |

## OPINION

RICHARD MILLS, United States District Judge:

Mark Alan Winger's Petition and Supplemental Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 are before the Court.

As directed, the Respondent filed an Answer under Rule 5 of the Rules Governing Section 2254 Petitions.

Upon reviewing the state court record,[2] the Court concludes that an evidentiary hearing under Rule 8 of the Rules Governing Section 2254 Petitions is not warranted.

---

[1] Brittany Greene, the Warden at the Western Illinois Correctional Center, is substituted as the proper Respondent under Federal Rule of Civil Procedure 25(d).

[2] The state court's factual findings are presumed to be correct. The movant may rebut that finding by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

I.      BACKGROUND

Factual background

In 2002, following a jury trial in the Circuit Court of Sangamon County, Winger was convicted of the first degree murders of Donnah Winger, his wife, and Roger Harrington, and sentenced to life in prison.  The trial included testimony from approximately 50 witnesses.  The evidence showed that, on August 29, 1995, Winger killed both victims at the Winger residence and attempted to frame Harrington for Donnah's murder.

At the time of the murders, Winger was involved in an extramarital affair with Donnah's friend, Deann Schultz.  During their month-long relationship, Winger repeatedly told Schultz "it would be easier if Donnah just died."  He discussed murdering Donnah with Schultz, telling Schultz, "all you have to do is come in and find the body."  Schultz told Winger that she planned to divorce her husband and he would need to divorce his wife.

The evidence at trial showed that six days before the murders, on August 23, 1995, and at Winger's insistence, Donnah wrote a letter describing her uncomfortable experience with an airport shuttle driver, who was later identified as Harrington.  According to the letter, Harrington drove at an excessive rate of speed, acted strangely and made Donnah nervous and uncomfortable.

Four days before the murders, on August 25, 1995, Winger asked Candice Boldin, a coworker, what would happen to his adopted daughter if Donnah died. The adoption was not yet complete.  Later that day, Winger called the shuttle service's president, Ray Duffy, and complained about Donnah's ride.  The following day, Winger called Duffy and asked for the driver's full name.  Two days later, Winger asked Duffy if he could speak to Harrington about the issue and Harrington told Duffy he would talk to Winger to straighten things out.  That same day, Winger told Schultz that "he needed to get that guy [Harrington] in his house."

On the day of the murders, Winger asked Schultz "if [she] would love him no matter what."  The same day, Harrington's friend Susan Collins overheard Harrington on the phone discussing a meeting with "Mark Winger" at "4:30 p.m.," which he then wrote down on paper.  After the call, Harrington told Collins he was going to meet Winger to take care of the matter and left around 3:30 p.m.

According to the testimony of various witnesses, Harrington arrived at Winger's residence before 3:50 p.m., and Winger killed Donnah and Harrington sometime before 4:27 p.m., when Winger called 911.  When police arrived at the Winger residence, Donnah lay face down on the floor and Harrington lay on his back.  Donnah died from brain trauma due to multiple blunt-force injuries to the head that were consistent with hammer strikes.  Harrington died from brain trauma

due to gunshot wounds to the top, left side of his head and above his left eyebrow. His chest had contusions caused by hammer strikes.

The evidence at trial showed that Winger offered differing accounts of the murders.  He initially reported to Officer Dan Jones that he had been exercising on a treadmill downstairs when he heard a thump.  He went upstairs, heard Donnah screaming, went to his bedroom, retrieved his handgun and upon seeing Harrington in the hallway beating Donnah on the head with a hammer, then shot Harrington.

During his interview with Sergeant Charles Cox, Winger recited these facts and also stated that after he shot him, Harrington fell and "rolled off" Donnah to the floor.  Winger also described how he shot Harrington in the forehead when he raised his head and how he later struck Harrington in the chest with a hammer because Harrington was "moaning and groaning."  Moreover, Winger asked Cox if the alleged intruder's name was Roger."  When Cox confirmed that his name was Roger Harrington, Winger stated, "Oh, my God, this is the guy that's been harassing us all week."  Winger told Cox about Donnah's shuttle ride, and that he had called Harrington earlier that morning to tell him that Donnah was not Harrington's friend and that Winger had filed a police report.

Winger later told his coworker Andrew Skaar that he was running on the treadmill, heard a thump, then saw Harrington hitting Donnah with a hammer, when

he retrieved his gun and shot Harrington.  Winger "was concerned" because he had told police that he had retrieved his gun before he saw Harrington beating Donnah.

In April 1997, during a deposition in another case, Winger testified in pertinent part that Harrington fell backwards after he shot him the first time, that he did not know whether his shot had missed, and that when Harrington "fell down it looked like [Harrington] was getting back up, so [he] stood over [Harrington] and shot him in the forehead."  The deposition was admitted into evidence at Winger's trial.

The evidence at trial showed that the morning after the murders, Winger told Schultz "that it was best for [Schultz] to stay as far away from the police as possible," and not to say anything to the police about their affair because although Winger thought police believed his story, it "would look bad."  During the conversation, Winger "seemed to be more concerned with the [police] investigation" than Donnah's death.  Less than 24 hours after Donnah's death, Winger submitted a claim for her life insurance proceeds.

Over the next few months, Winger made incriminating statements to Schultz.  Referring to Harrington, Winger said that "dead men don't talk," that the murder "didn't happen the way the paper said it did," and that he did not want Schultz to know the truth "because ignorance is bliss."  Winger expressed concern about the appointment note found in Harrington's car because it had Winger's name on it and

5

he believed police may have "bugged" his own car.   Winger and Schultz's relationship ended in March 1996.

The evidence showed that in the years after Donnah's death, Schultz received psychiatric treatment for increasing mental health issues caused by her guilt about knowing the truth about Donnah's murder.  Sometime after October 1998, Schultz called Winger to see if he would tell her that he killed Donnah and Harrington. Schultz asked Winger how he lived with himself and Winger responded that "he had found Jesus Christ and that he was forgiven."  When Schultz told Winger that she told her psychiatrist about the murders, Winger worried that "the psychiatrist could go to the police."  Winger also told Schultz that if she told anyone, their "gooses will be cooked."

In March 1999, based on her psychiatrist's advice, Schultz went to police and received immunity for her testimony.

At trial Tom Bevel, president of TBI, a consulting company specializing in bloodstain pattern analysis and crime scene reconstruction, testified as an expert that the bloodstain evidence from the crime scene showed that Winger shot Harrington in the top of the head, beat Donnah to death with a hammer and then after some time passed, rolled Harrington over and shot him in the forehead.

At the conclusion of the trial, the jury convicted Winger of the first degree murders of Donnah and Harrington and the trial court sentenced Winger to natural life in the penitentiary.

Procedural background

Winger appealed his conviction, contending that (1) the evidence was insufficient to prove him guilty of the murders; (2) he was denied due process when the trial court conducted *voir dire* without a court reporter, as required under state law; and (3) trial counsel was ineffective for waiving the court reporter's presence.

The Illinois Appellate Court affirmed Winger's convictions.

Winger filed a petition for leave to appeal (PLA) wherein he raised only the sufficiency of the evidence claim. His PLA was denied by the Illinois Supreme Court on October 6, 2004.

On March 17, 2005, Winger filed a motion to permit release of evidence for DNA testing under 725 ILCS 5/116-3. The trial court denied the motion. On August 28, 2017, the Illinois Appellate Court affirmed the judgment. Winger did not petition for review in the Illinois Supreme Court.

On March 30, 2005 Winger, through counsel, filed a postconviction petition, 725 ILCS 5/122-1, *et seq*., asserting the following claims:

(1) trial counsel was ineffective for failing to

7

(a) challenge the admissibility of Bevel's testimony under Illinois law,

(b) impeach Bevel with a prior report,

(c) cross-examine Schultz about her motivation to inculpate Winger, and

(d) impeach Schultz with evidence of her suicide attempt before the murders;

(2) direct appeal counsel was ineffective for not raising the foregoing ineffectiveness allegations; and

(3) the State knowingly failed to correct perjured testimony when it allowed Detective Doug Williamson to testify that he did not reopen the murder investigation because Schultz came forward.

The circuit court dismissed the petition.  On appeal, Winger raised the same claims and additionally argued that the State failed to disclose Schultz's purported cocaine addiction in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).  The Illinois Appellate Court affirmed and, on November 25, 2009, the Illinois Supreme Court denied Winger's ensuing PLA, which raised the same claims he asserted in the appellate court.

In June 2007, while his postconviction petition was pending, a Livingston County, Illinois, jury convicted Winger of soliciting the murder of Schultz and Jeff Gelman.  These convictions are not at issue in this habeas proceeding.

8

In December 2008, while his postconviction appeal was pending, Winger filed a second motion for release of evidence to permit DNA testing.  Approximately one year later, he filed a petition for relief from judgment under 735 ILCS 5/2-1401, claiming that (1) the State concealed that Schultz was an accomplice to the murders; (2) two jurors lied during *voir dire*; and (3) Detective Williamson lied about why the case was reopened.  The trial court denied the second DNA motion and dismissed the § 2-1401 petition.  Winger appealed both rulings.

In March 2014, while those appeals were pending, Winger filed a second § 2-1401 petition, contending that the State knowingly presented Bevel's false testimony.  The trial court dismissed the petition.  Winger's appeal from this ruling was consolidated with the appeals relating to his second DNA motion and first § 2-1401 petition.

In the consolidated appeal, as to the first § 2-1401 petition, Winger's appointed counsel argued only that a juror lied during *voir dire*.  The Illinois Appellate Court denied Winger leave to file supplemental pro se briefs raising other claims.  The Illinois Appellate Court affirmed the trial court's judgments denying Winger's second motion for DNA testing and dismissing his § 2-1401 petitions.  Winger filed a PLA, which the Illinois Supreme Court denied on May 24, 2017.

<u>Claims in Winger's § 2254 petition</u>

Winger's <u>first</u> <u>ground</u> is ineffective assistance of counsel when: (a) Counsel failed to request a "Frye" hearing to seek to exclude, limit, challenge, and/or strike the purported "blood spatter" testimony of the State's purported blood spatter expert; (b) Counsel failed to impeach the State's purported blood spatter expert with his earlier forensic report that was fundamentally inconsistent with his trial testimony; (c) Counsel provided insufficient impeachment and cross-examination of State's key witness Deann Schultz about Schultz's self-serving motivation to inculpate Winger in the 1995 deaths; and (d) Counsel failed to obtain evidence readily available to him to impeach Schultz for her failure to testify truthfully about her mental health history. As a result, Winger alleges his right to counsel under the Sixth and Fourteenth Amendments was violated.

Winger's <u>second</u> <u>ground</u> is ineffective assistance of appellate counsel, wherein he claims that appellate counsel was ineffective for raising only the sole claim of insufficiency of the evidence and for not raising the much stronger claims on direct appeal regarding ineffective assistance of trial counsel described in ground one, which would have strengthened the sole argument raised by appellate counsel. He claims this also violated his right to counsel.

Winger's <u>third</u> <u>ground</u> is that the State committed a violation under *Brady v. Maryland*, 373 U.S. 83 (1983), when the State failed to disclose that its key witness,

Deann Schultz, was a cocaine addict. He contends this violated his due process rights under the Fifth and Fourteenth Amendments.

Winger's <u>fourth</u> <u>ground</u> is that the prosecutor used perjured testimony to obtain a conviction when a police officer gave false testimony at trial and the prosecutor failed to correct testimony that he knew or should have known was false, resulting in prejudice and violating Winger's due process rights.

Winger's <u>fifth</u> <u>ground</u> is that the State presented insufficient evidence to establish his guilt beyond a reasonable doubt, thereby violating his due process rights under the Fifth and Fourteenth Amendments.

Winger's <u>sixth</u> <u>ground</u> is asserted in his supplemental petition, wherein he alleges the state court's denial of his second request to release for DNA testing evidence including the murder weapon and the clothing of Roger Harrington could establish actual innocence.

Winger's <u>seventh</u> <u>ground</u> is that bias was concealed at voir dire when one of the jurors lied about her biological relationship to a key witness for the State in order to conceal her bias against Winger, thereby violating his right to a fair and impartial jury.

Winger's <u>eighth</u> <u>ground</u> is that the State's forensic expert, Bevel, colluded and conspired with State actors to put forth fraudulent expert witness testimony, thereby

violating Winger's right to a fair trial and due process, in violation of *Napue v. Illinois*, 360 U.S. 264 (1959).

Winger's ninth ground is that the State failed to disclose evidence about the prosecutor's knowledge or belief that the State's star witness, Deann Schultz, was actually an accomplice to the murders, thereby interfering with defense counsel from requesting a cautionary "accomplice witness" jury instruction, which Winger claims resulted in prejudice and violated his constitutional rights to a fair trial and due process.

## II.   DISCUSSION

### Procedurally defaulted grounds

A federal court does not typically review claims "resolved by the state court on independent and adequate state law grounds." *Snow v. Pfister*, 880 F.3d 857, 868 (7th Cir. 2018)  A state prisoner must exhaust his remedies in state court before seeking relief in federal court. *See* 28 U.S.C. § 2254(b)(1)(A).  "State prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).  In Illinois, this means that the prisoner must include his claims in a petition for leave to appeal to the Illinois Supreme Court. *See id*. at 845-46.  Failure to do so results in procedural default, barring review of the claims. *See id*. at 848.

"Procedural default may be excused [] where the petitioner demonstrates either (1) cause for the default and actual prejudice or (2) that failure to consider the claims will result in a fundamental miscarriage of justice." (internal quotation marks and citations omitted). *Snow*, 880 F.3d at 864.

The record shows that the Illinois Appellate Court disposed of grounds 1b (that trial counsel was ineffective for failing to impeach Bevel with his prior report), 2b (that appellate counsel was ineffective for failing to raise ground 1b) and ground 8 (that the State knowingly presented false testimony from Bevel) on the independent and adequate ground that the claims were forfeited. These procedural rulings are independent and adequate state law grounds precluding federal review. *See Perry v. McCaughtry*, 308 F.3d 682, 688 (7th Cir. 2002). Winger has not established actual prejudice or that the failure to consider the claims will result in a fundamental miscarriage of justice. Accordingly, grounds 1b, 2b and 8 are procedurally defaulted.

As for ground 7—that Winger was denied a right to an impartial jury because a juror lied during *voir dire*—the Illinois Appellate Court determined that the claim was untimely because Winger failed to assert it within the two-year statute of limitations for § 2-1401 petitions. The court also concluded that relief was unwarranted because Winger failed to satisfy § 2-1401's requirement that the petition be supported by adequate documentation. The Illinois Appellate Court thus

13

rejected ground 7 on two independent and adequate state law grounds.  Accordingly, ground 7 is procedurally defaulted.

In ground 9, Winger claims that the State concealed evidence that Schultz was an accomplice to the murders.  The record shows that Winger did not fairly present ground 9 through one complete round of state court review.  Winger's appointed counsel did not raise the claim on appeal from the denial of his initial § 2-1401 petition.  The Illinois Appellate Court denied Winger leave to file a pro se supplemental brief raising the claim.  Accordingly, the unauthorized claim falls outside of the appellate record.

Additionally, the Illinois Appellate Court disposed of ground 9 on independent and adequate state law grounds.  Its order denying Winger leave to file a pro se supplement is grounded in Illinois's rule against hybrid representation which provides an independent and adequate state law ground precluding federal review. *See Clemons v. Pfister*, 845 F.3d 816, 820 (7th Cir. 2017).  As with ground 7, the Illinois Appellate Court's rejection of Winger's initial § 2-1401 petition as untimely is another independent and adequate state law ground precluding federal review.  Accordingly, ground 9 is procedurally defaulted.

Legal standards on remaining grounds

To obtain habeas relief on his remaining grounds, Winger must show that the Illinois Appellate Court's rejection of the grounds was "contrary to, or involved an

14

unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  Alternatively, he must show that the court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).

The § 2254 standard is "difficult to meet" and "highly deferential."  *Makiel v. Butler*, 782 F.3d 882, 896 (7th Cir. 2015).  It is not a "vehicle to second-guess the reasonable decisions of state courts."  *Id*.

To satisfy *Strickland v. Washington*, 466 U.S. 668 (1984), a petitioner must show that (1) counsel's performance was deficient; and (2) the deficiency resulted in prejudice.  *See id*. at 690.  A petitioner must show that counsel's performance "fell below an objective standard of reasonableness."  *See id*. at 688.  To establish prejudice, he must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability to undermine confidence in the outcome."  *Id*. at 694.  "The bar for establishing that a state court's application of the *Strickland* standard was unreasonable is a high one: we have stated on prior occasions that only a clear error in applying *Strickland* would support a writ of habeas corpus because *Strickland* calls for inquiry into degrees, thereby adding a layer of respect for a state

court's application of the legal standard." *Murrell v. Frank*, 332 F.3d 1102, 1111 (7th Cir. 2003) (internal quotation marks and citations omitted).

(Ground 1a)

Winger alleges counsel was ineffective for not challenging the admissibility of Bevel's testimony under Illinois law.  The Illinois Appellate Court found that because Bevel's testimony was admissible under Illinois law, trial counsel was not ineffective for failing to challenge its admissibility.  That determination based on Illinois state law ends the inquiry.  "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *See Hanson v. Beth*, 738 F.3d 158, 161 (quoting *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991)).  Because there was a reasonable basis for the state court's decision, the Illinois Appellate Court's decision was not objectively unreasonable.  This Court cannot disturb a state court's resolution of a state law issue. *See Miller v. Zatecky*, 820 F.3d 275, 277 (7th Cir. 2016).

Winger is not entitled to habeas relief on ground 1a.

(Grounds 1c and 1d)

Winger alleges trial counsel was ineffective for not adequately cross-examining or impeaching Schultz.  In ground 1c, Winger claims trial counsel should have asked Schultz whether she talked to police and inculpated him because her psychiatrist told her that it was the only way to cure her suicidal impulses.  As the

16

Illinois Appellate Court noted, the jury heard this information when her psychiatrist testified he encouraged Schultz to tell police about Winger because her suicidal thoughts would continue if she did not reveal the information.  It was a reasonable strategic decision for counsel to decide not to emphasize this information by cross-examining Schultz on the point.

It is worth noting that the State believed Schultz came forward to alleviate her guilt and depression about knowing the truth regarding Donnah's murder.  The State had elicited the testimony from Schultz's psychiatrist.  The post-conviction trial court noted the psychiatrist's advice to "Schultz to come forward to the police gives circumstantial credibility to the legitimacy of her statements."  Accordingly, Winger's assertion that Schultz came forward solely to get better does not negate the prosecution's theory that Schultz came forward to alleviate her guilt and depression about knowing the truth about Donnah's murder.  It was a reasonable strategic decision for trial counsel not to highlight this point.

Winger's theory also strains credulity in that it is illogical to believe that a psychiatrist would compel a patient to compound her mental instability by perjuring herself and putting an innocent man in prison.  It was a reasonable tactical choice to avoid going down that road.  Accordingly, trial counsel's choices regarding Schultz's testimony constituted reasonable trial strategy and ground 1c fails under the deferential standard of review.

In ground 1d, Winger alleges trial counsel should have impeached Schultz with evidence of her purported suicide attempt prior to the murders. As an initial matter, the record does not include any admissible evidence that Donnah attempted suicide prior to the murders. Moreover, trial counsel cross-examined Schultz about her lengthy mental health history, questioning her about her anxiety, depression and psychiatric treatment before Donnah's murder. Given that the jury was aware Schultz's mental health issues predated the murder, counsel may have strategically determined there was no additional value to revealing her prior suicide attempt.

Additionally, the state trial court found that "[t]rial counsel conducted an extensive, competent cross-examination of Deann Schultz. She testified for many hours over two days, and trial counsel went to great lengths to impeach her testimony." The record also shows that counsel filed pre-trial motions, including motions to bar Schultz's testimony, limit testimony from Schultz's psychiatrist that would have corroborated Schultz's testimony, suppress Winger's statements and dismiss the indictments. Counsel presented witnesses that challenged the State's witnesses and theory of the case and presented an alternative theory. The Court concludes counsel was not deficient for failing to challenge Schultz on this point. Winger is unable to overcome the strong presumption that counsel's handling of Schultz was sound trial strategy.

Additionally, Winger is unable to establish prejudice.  Given the number of ways counsel sought to undermine Schultz's credibility, there is no reasonable likelihood that if counsel cross-examined Schultz on these two minor points, the result of the trial would have been different.

Based on the foregoing, the Court concludes the state court's judgment rejecting Winger's ineffective assistance of trial counsel allegations was not objectively unreasonable.

(Grounds 2a, 2c, 2d-Ineffective assistance of appellate counsel)

The Court has already determined that Winger's allegations of ineffective assistance of trial counsel (grounds 1a, 1c and 1d) are without merit.  It was thus reasonable for appellate counsel not to raise those grounds.  *See Stone v. Farley*, 86 F.3d 712, 717 (7th Cir. 1996).  The Illinois Appellate Court's rejection of these grounds was neither contrary to, nor an unreasonable application of, *Strickland*.

(Ground 3)

Winger seeks habeas relief in ground 3 on the basis that the State's failure to disclose that Schultz was "a cocaine addict" was a due process violation under *Brady*.  To show a due process violation under *Brady*, Winger must first establish that the State withheld evidence.  *See Smith v. Cain*, 565 U.S. 73, 75-76 (2012).  The state court held that Winger cannot demonstrate that the State withheld any evidence that Schultz was addicted to cocaine.  Although the State disclosed that Schultz had

19

abused cocaine, the record contained no evidence suggesting she was an "addict." Because there was no evidence on this crucial point, the state court reasonably rejected Winger's *Brady* claim.   Accordingly, Winger is entitled to no relief on ground 3.

(Ground 4)

Winger claims in ground 4 that the prosecutor knowingly used perjured testimony, which would violate his due process rights under *Napue v. Illinois*, 360 U.S. 264, 269-70 (1959).  Winger alleges the State knowingly failed to correct false testimony when defense counsel elicited testimony from Detective Williamson  that the murder investigation was not reopened because Schultz came forward.  The record shows that the Illinois Appellate Court cited a state court decision that correctly recited the proper standard.

The Court concludes that the state court did not unreasonably apply *Napue*. A petitioner must first establish that the testimony was false.  The Seventh Circuit has repeatedly held that "mere inconsistencies in testimony by government witnesses do not establish the government's knowing use of false testimony."  *United States v. Saadeh*, 61 F.3d 510, 523 (7th Cir. 1995) (quoting *United States v. Verser*, 916 F2d. 1268, 1271 (7th Cir. 1990)).

The record shows that on cross-examination, Williamson answered in the negative when counsel asked if the investigation was reopened because Schultz gave

20

him more information.  On redirect examination, Williamson explained the timeline as he recalled it: (1) he received permission from his supervisor to "send a couple of items off for testing," thus reopening the case to a limited extent; (2) Schultz came forward soon thereafter; (3) police obtained further evidence; and (4) police "totally reopen[ed]" the case.  Williamson testified that the evidence he received after Schultz came forward was not the "single and sole reason" for reopening the case. A number of factors contributed to the decision.

Winger is unable to establish Williamson's testimony was false.  As an initial matter, Williamson fails to overcome the presumption of correctness that attaches to the state postconviction trial court's finding that Williamson's testimony was both credible and consistent with the prosecutor's representation as to the timeline of reopening the case.  Williamson could only testify as to his recollection of the reasons for reopening the case based on his actions and role in the investigation.  It is unremarkable and irrelevant that other officers who were involved in the case at different times and had different responsibilities may have had other opinions as to the reasons for reopening the case.  That does not make Williamson's testimony false.  At most, as the state appellate court reasonably found, such statements amount to mere inconsistences, which are insufficient to establish that the State knowingly used false testimony.

21

Even assuming Williamson's testimony was false, Winger cannot establish that the state court unreasonably applied *Napue*. The United States Supreme Court has not determined whether "*Napue* and its successors apply when the defense rather than the prosecutor elicits the false testimony[.]" *Long v. Pfister*, 874 F.3d 544, 548-49 (7th Cir. 2017) (en banc). Because defense counsel elicited the allegedly false testimony, § 2254 precludes any relief. *See id*. at 550; *see also Woods v. Donald*, 135 S. Ct. 1372, 1377-78 (2015) (if no U.S. Supreme Court decision has confronted the specific question presented, a state court's decision cannot be contrary to any Supreme Court holding). Accordingly, Winger is entitled to no relief on ground 4.

This Court further notes that Winger also cannot establish prejudice. The postconviction trial court explained, "The subject matter of when the criminal investigation was re-opened is of extraordinarily limited probative value to any issue of consequence in Winger's trial." There is no likelihood that the testimony as to when the investigation was reopened had any bearing on the jury's verdict. Accordingly, the state court's rejection of ground 4 was neither contrary to, nor unreasonable application of, *Napue*.

(Ground 5)

Winger alleges in ground 5 that the evidence was insufficient to establish his guilt beyond a reasonable doubt, thereby violating his due process rights under the Fifth and Fourteenth Amendments of the United States Constitution. The inquiry

involves whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "*Jackson* requires a reviewing court to review the evidence 'in the light most favorable to the prosecution.'" *McDaniel v. Brown*, 558 U.S. 120, 133 (2010) (quoting *Jackson*, 443 U.S. at 326). In other words, this Court must "presume— even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id*. That is particularly true in federal habeas proceedings which are "subject to two layers of judicial deference." *Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (per curiam).

Winger is unable to show that the Illinois Appellate Court's judgment was contrary to, or an unreasonable application of, *Jackson*. The state court found, upon viewing the evidence in the light most favorable to the prosecution, a rational jury could have found beyond a reasonable doubt that Winger, without lawful justification, intentionally shot Harrington and bludgeoned Donnah to death. Schultz testified regarding Winger's statements before the murder, which expressed his desire and plans for killing Donnah—the statement about finding Donnah's body and questioning whether she "would love him no matter what." Additionally, Winger's rather extreme reaction to Donnah's shuttle ride-numerous calls to Duffy

until he was able to speak directly to Harrington when no evidence suggested Harrington was a threat—along with his statement to Schultz about getting Harrington in the home evinced his plan to lure Harrington to his home to frame him for Donnah's murder. There was evidence Winger executed that plan by scheduling a meeting with Harrington and Harrington thus arrived at Winger's home.

Additionally, the State's forensic expert, Bevel, testified the bloodstain evidence was consistent with Winger having shot Harrington and bludgeoning Donnah, which alone disproved Winger's justification defense. Other factors also undermined Winger's defense: (1) it would seem unlikely Donnah would have let Harrington—a man she was purportedly afraid of—into the home while Winger was exercising in the basement; (2) the happenstance that a hammer was on the dining room table when Harrington arrived; and (3) Winger gave a number of inconsistent accounts of the murders, including discrepancies as to the sequence of events and how Harrington fell and why Winger shot him a second time. Winger's statements and actions after the murders—including telling Schultz to withhold information from police and immediately claiming Donnah's life insurance proceeds—were also evidence of guilt. Therefore, when the evidence is viewed in a light most favorable to the prosecution, a rational jury could have found Winger guilty of both murders beyond a reasonable doubt.

Given the legal standard, it is not the role of this Court to reweigh the evidence. Winger's arguments that defense bloodstain expert Terry Laber was more credible than Bevel and that Schultz was unbelievable are thus not persuasive. A rational juror could have believed Bevel over Laber and could also have drawn inferences from Schultz's testimony upon assessing her credibility and weighing her testimony. A rational juror could have found Schultz credible.

The jury was convinced beyond a reasonable doubt that Winger killed both Donnah and Harrington. "[T]he only question under *Jackson* is whether that finding was so insupportable as to fall below the threshold of bare rationality." *Coleman*, 566 U.S. at 656. The Illinois Appellate Court's determination that it was not "is entitled to considerable deference under AEDPA, 28 U.S.C. § 2254(d)." *Id*. The state court reasonably determined that the trial evidence was sufficient to convict Winger of Donnah Winger's and Roger Harrington's murders. Therefore, ground 5 fails under § 2254(d)'s particularly deferential standard of review.

Winger alleges in ground 6 that DNA testing of the murder weapon and clothing of Harrington could establish actual innocence and the failure to do so violates his constitutional rights. He claims he was entitled to DNA testing under Illinois law, 725 ILCS 5/116-3. However, this is a federal habeas proceeding and state law questions are not cognizable on federal review. *See Hanson v. Beth*, 738 F.3d 158, 161-62 (7th Cir. 2013).

Ground 6 also fails because Winger has no federal due process right to postconviction DNA testing.  *See Dist. Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 73 (2009).  The state court's failure to provide Winger with that testing is not a basis for § 2254 relief.

Winger's claim also fails because habeas corpus is not the proper vehicle for him to challenge the state court's DNA ruling because "[i]n no event will a judgment that orders DNA tests 'necessarily impl[y] the unlawfulness of the State's custody.'" *Skinner v. Switzer*, 562 U.S. 521, 525, 534 (2011); *see* 28 U.S.C. § 2254(a) (authorizing habeas relief "only" when prisoner's "custody" violates federal law). Section 2254 does not authorize federal courts to order relief that "neither terminat[es] custody, accelerate[es] the future date of release from custody, nor reduc[es] the level of custody."  *Skinner*, 562 U.S. at 534 (quotation marks and citation omitted).  Accordingly, ground 6 is not cognizable on habeas review.

## III.  CONCLUSION

For the reasons stated herein, all of Winger's claims are either procedurally defaulted or fail on the merits.

Winger is entitled to no relief under 28 U.S.C. § 2254.

His petition will be denied.

Upon reviewing the record, the Court finds that Petitioner Mark Winger has not "made a substantial showing of the denial of a constitutional right," *see* 28 U.S.C.

§ 2253(c)(2), and thus is not entitled to a certificate of appealability under Rule 11(a) of the Rules Governing Section 2254 Cases.

Regarding his constitutional claims, he has failed to "demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," as required under § 2253(c). *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). As for the claims dismissed on procedural grounds, a certificate of appealability should issue if the petitioner shows, "at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."

Winger has made no such showing.

Because reasonable jurists would not find it debatable that Winger's claims are procedurally defaulted, not cognizable and/or meritless, the Court will deny a certificate of appealability under Rule 11(a).

Upon reviewing the petition, answer, transcripts and records of state-court proceedings, the Court further finds that an evidentiary hearing is not warranted.

Ergo, Petitioner Mark Alan Winger's Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 [d/e 1] is DENIED.

A certificate of appealability is DENIED.

The Clerk will substitute Brittany Greene, Warden of Western Illinois Correctional Center, as the proper Respondent under Federal Rule of Civil Procedure 25(d), and terminate Justin Hammers as Respondent.

The Clerk will enter Judgment and terminate this case.

ENTER: March 29, 2021

FOR THE COURT:

/s/ *Richard Mills*
Richard Mills
United States District Judge